# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-CA-00739-COA

LISA MARIE FRY PERKINS RAFFERTY                  APPELLANT

v.

VERNON WAYNE PERKINS, JR. AND GERALD F. EASTER       APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 04/07/1997 |
| TRIAL JUDGE: | HON. PERCY LEE LYNCHARD |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GERALD W. CHATHAM SR. |
| ATTORNEYS FOR APPELLEES: | JACK R. JONES III |
| | RONALD LOUIS TAYLOR |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | JUDGMENT IN FAVOR OF VERNON WAYNE PERKINS ADJUDICATING HIM TO BE THE BIOLOGICAL FATHER OF JUSTIN PATRICK PERKINS |
| DISPOSITION: | REVERSED AND REMANDED - 05/18/99 |
| MOTION FOR REHEARING FILED: | 6/1/99; denied 08/17/99 |
| CERTIORARI FILED: | 09/02/99; granted 10/21/99 |
| MANDATE ISSUED: | |

EN BANC.

McMILLIN, C.J., FOR THE COURT:

¶1. This case is an appeal prosecuted in the name of Lisa Marie Perkins Rafferty as next friend for her minor child, Justin Patrick Perkins. The issue on appeal is whether a jury verdict on the question of the child's paternity may be permitted to stand. We will assume for the moment, but only for purposes of discussion, that this child has a legitimate interest in further pursuing a legal determination of his biological paternity. Based on that temporary assumption, which we otherwise leave as an open question to be addressed on remand, we reverse the jury verdict as being against the weight of the evidence. We remand for such further proceedings as may be appropriate after all the issues discussed in this opinion have been resolved with the view of advancing the best interest of the child at every step.

# I.

## Facts

¶2. Vernon Wayne Perkins, Jr. and Lisa Marie Fry Perkins Rafferty were married and living in Desoto County. Mrs. Rafferty, at the age of nineteen, began working as a receptionist in a Memphis law firm and became involved in an on-again off-again sexual relationship with Mike Rafferty, an attorney in the firm. Mr. Rafferty was also married at the time this relationship began. During the course of the relationship, Mrs. Rafferty became pregnant. Although she suspected that Mr. Rafferty was the father of the child, she did nothing to make her suspicions known. Rather, she remained in the marital relationship with Mr. Perkins and, when the child, Justin Perkins, was born, she had Mr. Perkins listed as the father on the child's birth certificate. Mr. Perkins and Mrs. Rafferty were later divorced. In that proceeding, both parties represented to the chancellor under oath that Justin Perkins was their child, born in wedlock. The parties agreed to share joint legal custody of the child and Mr. Perkins committed to paying periodic child support, which, insofar as the record indicates, he has paid faithfully and Mrs. Rafferty has accepted just as faithfully.

¶3. After Mrs. Rafferty's divorce from Mr. Perkins, Mr. Rafferty also obtained a divorce and the two were married. At some point, Mrs. Rafferty determined to have scientific blood testing done to establish that Mr. Rafferty was, in fact, the biological father of the child, Justin Perkins. To her apparent surprise, this turned out not to be the case. As a result, Mrs. Rafferty began to explore the possibility that her pregnancy may have arisen out of a one-time extramarital sexual encounter with another Memphis attorney, Gerald Easter. When confronted with the possibility of his paternity of the child, Mr. Easter agreed to undergo paternity testing, the results of which indicated a greater than 99% probability that he was Justin Perkins's biological father.

¶4. Mrs. Rafferty, possessed of this information, commenced an action in her own name and as next friend for her minor son in the Desoto County Chancery Court against her former husband, Mr. Perkins, asking that Mr. Easter be declared the true biological father of the child. On its face, the complaint was not intended to derive any benefit for the child from this adjudication of paternity. Mrs. Rafferty sought no support from Mr. Easter for the benefit of her son and did not ask that her son be declared a legal heir of Mr. Easter. To the contrary, Mrs. Rafferty alleged quite openly that the purpose of the litigation was to have her child "declared not to be the child of Vernon Wayne Perkins" so that her present husband, Mike Rafferty, could adopt the child, the anticipated adoption proceeding to "be joined in by the child's biological father, Gerald Easter, and filed immediately upon this Court's determination of paternity."

¶5. After much procedural wrangling, the details of which have little to do with our decision, the matter wound up with Mrs. Rafferty withdrawing as a plaintiff in her own name, but remaining in the litigation solely as next friend of her child. A guardian ad litem was appointed for the child, but the guardian took no active part in the conduct of the litigation beyond filing two brief letters. The first letter stated, without further explanation, that he, "having met with the parties and pertinent individuals believe[d] it to be in the best interest of the child that the Motion For Blood Testing of Vernon Wayne Perkins, Jr. be granted." The second letter indicated that the guardian thought it was in the child's best interest for his "true lineage" to be determined (a) for possible future medical needs and (b) so that the child could be told about this lineage "at the appropriate time in his future, if he so desires to know . . . ." Beyond those perfunctory efforts, there is no indication that the child's guardian ad litem played any significant role in the litigation. Rather, the actual management of the litigation, from the plaintiff's standpoint, remained under the control of Mrs. Rafferty and

her attorney.

¶6. Ultimately, the putative biological father, Gerald Easter, was added as a defendant. Mr. Easter voluntarily appeared in the case by joining in the motion to add him as a defendant. Mr. Easter never filed an answer, was not represented by counsel, and took no part in the trial beyond testifying as a witness.

¶7. The case was tried first in Desoto County Court to a jury that returned a verdict adjudicating Mr. Easter to be the biological father. However, the trial judge set aside that verdict and ordered a new trial on two grounds. First, he determined that he should not have permitted the case to proceed in the child's name at the sole insistence of the mother at a time when the mother and presumed father had joint legal custody of the child and there was no evidence that the father had consented to the suit or that the chancellor had approved the litigation after hearing any objection that the father might have. Secondly, he determined that he had erred in admitting evidence of blood testing that had not been obtained pursuant to the provisions of Section 93-9-23 of the Mississippi Code. After setting aside the judgment entered on the jury's verdict, the judge also ordered the case transferred to Desoto County Chancery Court.

¶8. The case was ultimately retried before a jury in the chancery court. That jury returned a verdict in the following form: "We, the jury, find in favor of Defendant Vernon Wayne Perkins, Jr." The chancellor entered a judgment on the verdict that stated that "Vernon Wayne Perkins, Jr. is the biological father of the child, Justin Patrick Perkins, and Gerald Easter is not the biological father of the child, Justin Patrick Perkins."

¶9. The chancellor denied the plaintiff's motions for a JNOV or, alternatively, a new trial, and this appeal was perfected.

¶10. Among other issues, Mrs. Rafferty, purporting to act as next friend of Justin Perkins, urges that the county court verdict was correct and ought to be reinstated. Alternatively, she urges that the chancellor erred in not granting a JNOV after the jury in that proceeding returned its verdict. Should we determine either of these issues to have merit, we would be required to reverse and render a judgment adjudicating Gerald Easter to be the biological father.

¶11. In the event we find it inappropriate to reverse and render a judgment to that effect, Mrs. Rafferty alternatively urges that we ought to order a new trial on the ground that the chancery jury's verdict was against the weight of the evidence. It is this final issue that we find to have merit.

## II.

### The Weight of the Evidence

¶12. Mrs. Rafferty argues that the results of the scientific blood testing were so compelling on the question of Mr. Easter's paternity of her child that the jury's decision to disregard those test results was against the weight of the evidence. She claims that there is not enough evidence in the record indicating that Mr. Perkins (or anyone else, for that matter) was the biological father to overcome the overwhelming scientific evidence brought to bear on the question.

¶13. Mr. Perkins counters with the argument that the presumption that he is the child's father, based on the uncontradicted fact that the child was born during his marriage to Mrs. Rafferty is one of the strongest presumptions recognized in the law. *See, e.g., Baker v. Williams,* 503 So. 2d 249, 253 (Miss. 1987);

*Stone v. Stone,* 210 So. 2d 672, 674 (Miss. 1968). He points out that the statute regarding introduction of scientific paternity testing unequivocally says that, even when genetic testing demonstrates a probability of paternity in excess of ninety-eight percent, the testing still creates only a "rebuttable presumption, affecting the burden of proof . . . ." Miss. Code Ann. § 93-9-27(2) (Rev. 1994). Lastly, Mr. Perkins points out that he testified that, during the period of the child's conception, he and Mrs. Rafferty were having normal marital sexual relations, so that non-access of the father to the mother was not shown. Mr. Perkins urges that the combination of these factors provide a sufficient undergirding to support the jury's verdict against Mr. Easter's paternity.

¶14. As the Mississippi Supreme Court indicated in *Karenina v. Presley*, this Court cannot turn a blind eye to scientific advancement. *Karenina v. Presley,* 526 So. 2d 518, 524 (Miss. 1988). Based on the premise that it is, from a scientific standpoint, possible to absolutely exclude a person as being the father, we are bound to accept the fact that the scientific testing in this case demonstrates beyond dispute that Mr. Perkins is not the biological father of this child. We conclude that this seemingly-irrefutable evidence is sufficient to overcome the common law presumption of paternity, though one of the strongest in the law, that arose by virtue of the fact that the child was born during the marriage of Mr. Perkins and Mrs. Rafferty. In the absence of the benefit of that presumption, we conclude that the scientific evidence of a 99.94% probability of Easter's paternity invokes the statutory rebuttable presumption of paternity created by Section 93-9-27(2). Finally, we determine that the remaining evidence in the record, even when viewed in the light most favorable to upholding the verdict, was so inadequate as to lead us to conclude that the jury's verdict was against the weight of the evidence and that the trial court erred in denying the new trial motion.

¶15. Nevertheless, on remand, before this case is retried, we conclude that certain matters must be addressed to ensure that the best interests of this child are properly considered. We will now proceed to discuss those matters.

### III.

### The Separate Interests of the Child in this Litigation

¶16. Chancellors, it has been rightly said, act as super guardian for minors who, for whatever reason, come before the chancery courts of this state. *Hill v. Smith,* 558 So. 2d 854, 857 (Miss. 1990); *Union Chevrolet Co. v. Arrington,* 162 Miss. 816, 138 So. 593, 595 (1932). This places a heightened duty on the chancellor to be extraordinarily vigilant in seeing that the rights of these minors are protected when some person, purporting to act as "next friend" of the minor seeks to assert some right in the child's name, even when that "next friend" is a blood relation of the closest order of kinship. In the situation where the right purportedly asserted for the benefit of the child, on closer inspection, appears to be primarily of benefit to the minor's purported "friend," the need arises for the chancellor to be even more guarded in the course of the proceedings.

¶17. On the face of this case, there can be little doubt that the litigation was commenced principally for the benefit and convenience of Mrs. Rafferty and her new husband, Mr. Rafferty. Nowhere in the record or the briefs is there an articulation as to why it was a matter of sufficient urgency to substantially and forever disrupt the life of this seven-year-old child and tie up the limited judicial resources of this state to obtain a formal adjudication that the child's biological father is a man who never had a meaningful relationship with the child's mother and has no real intention of ever establishing any sort of relationship with the child. Paternity suits, as any other litigation, ought to have some demonstrable beneficial purpose for the plaintiff,

especially when the plaintiff is a seven- year-old child. This Court has serious reservations that, viewed from the best interest of this child - and not from the selfish standpoint of the child's mother and his new stepfather (who, remarkably, does not even have sufficient standing to be a party to this proceeding) - there was any prospect of advantage to this child by the commencement or continuation of this suit. It is difficult to see that this litigation has any legitimate purpose beyond eliminating Mrs. Rafferty's former husband from her child's life without any consideration by an objective person unconnected to the mother as to whether that result would be in the best interest of the child. This view holds especially true on the particular facts of this case, where paternity is not sought to be established to obtain some advantage for the child in terms of monetary support, right of inheritance, or other benefit to be derived from the biological father. It is essentially beyond dispute that the biological father has never expressed any interest in the child's welfare, never offered any past support, never made any meaningful effort to form any emotional or familial bonds with the child, and has not the slightest intention of doing so in the future. The biological father's sole role in this litigation is to act as the necessary "straw man" to defeat Mr. Perkins's parental rights granted him under long-standing and laudatory legal principles so that Mr. Perkins's place may be taken by Mr. Rafferty, who enjoys no better biological claim to parenthood than does Mr. Perkins. This entire plan is a concoction of the mother, the biological father, and the new husband, as evidenced by their pre-litigation pact of dubious propriety regarding the subsequent adoption. It is an understatement, to say the least, to suggest that it is difficult to discover how this scheme might be said to be advancing the child's best interest.

¶18. It is for this very reason that the Mississippi Supreme Court has suggested, in the strongest terms, that a child in a situation such as this needs a guardian ad litem. *Baker,* 503 So. 2d at 253.

¶19. We observe that the chancellor in this case did appoint a guardian ad litem for the child. However, we also observe that, based on our review of this record, it is evident that the guardian ad litem did not begin to undertake his duties with the necessary independence that was so clearly indicated. When a guardian ad litem is appointed for a child in a case which was commenced by an adult acting as "next friend," and when that next friend clearly has an agenda in the litigation that may or may not run parallel with the best interests of the child, we conclude that serving as a guardian ad litem means something more than undertaking to file two brief letters with the court and leaving the primary management of the litigation to the next friend and the attorney who is, beyond question, representing the next friend's interests and not necessarily those of the child. Rather, it is our view that *Baker* contemplates the substitution of the disinterested guardian ad litem for the conflicted next friend as nominal plaintiff. If the guardian ad litem is not an attorney, we conclude further that the *Baker* decision contemplates that the guardian ad litem will retain counsel to represent the child's interests that does not have the unavoidable conflict of interest that the former next friend's attorney has. *See Karenina v. Presley,* 526 So. 2d at 520 (Biological father, who commenced suit, "withdrew as next friend and Boris Badanov, Jr., an attorney, was appointed as guardian ad litem. . . .")

¶20. Having reached that stage in the matter, it can be seen that one of the fundamental duties of the guardian ad litem is to give due consideration to the threshold question of whether it is in the child's best interest to continue the litigation at all. There can be little doubt after the decision in *Baker* that the decision as to whether to pursue the litigation, even if such a cause of action might exist, does not, in the final analysis, lie with the mother. The mother, after a divorce in which she has represented to the court under oath that the child is the product of the dissolving marriage and after she has reaped the benefits of that representation through the receipt of child support, seems to be judicially estopped from actively pursuing, in her own right, an adjudication that would have the effect of making a perjurer of herself. *Ivy v. Harrington,* 644 So. 2d 1218, 1222 (Miss. 1994). To permit her to merely add her child's name to the

litigation, yet continue to actively control the course of the litigation, without any real inquiry as to whether she were advancing the child's interest or her own selfish motives, would be to make a sham of the concept of a minor as a distinct party in the litigation. This Court is not prepared to permit such an artful dodge to be practiced on the judiciary of this state.

¶21. The child is the plaintiff in this suit - not the mother - and normally a plaintiff sues to gain some advantage. There has been no showing as to how the true plaintiff would benefit from suing out this claim. When the plaintiff, as in this case, is a child of tender years incapable of making informed decisions for himself as to the advisability of pursuing a particular course of litigation, the law requires that the child's interests be represented by a competent guardian ad litem, independently advancing the child's interests even when those interests might prove antagonistic to a parent. It is the view of this Court that the guardian ad litem appointed for the child failed utterly in considering the threshold question of whether this litigation was advisable as advancing this child's welfare. Merely because a paternity suit *can* be brought does not necessarily lead to the conclusion that it *must* be brought. In the only entry in the lengthy record of this case where the guardian ad litem purported to address the advisability of continuing this litigation, the guardian articulated only two reasons: (a) so that the child could be told about his parentage at some unspecified time in the future if it turned out that the child himself wanted to know and (b) to meet any "future medical needs" of the child. On the face of it, these considerations simply do not merit the continuation of this litigation. Assuming that, at some time in the future, this child is interested in learning the identity of a biological father whose sole interest in his life was to surrender him for adoption, then that information will be available whether this litigation continues or not. As to the "future medical needs" claim, it must be assumed that the guardian ad litem was addressing possible future medical problems that had a genetic component, so that the treatment might depend on determining biological lineage. It is ludicrous on its face to suggest that, if this child has some inherited genetic disorder, a doctor would decline to treat the child appropriately simply because there was no court order adjudicating Easter to be his biological father.

¶22. It is certainly the case that there may be other legitimate reasons that it would advance the interests of this child to continue to pursue an adjudication of his biological paternity. It is equally certain, however, that if such reasons exist, they were not articulated by the guardian ad litem nor do they spring spontaneously to the collective mind of this Court based on our review of this record. We do not, by our decision, foreclose absolutely the possibility that the continued pursuit of this litigation would advance the child's interest, but only observe that, until now, the basis for such a conclusion has not emerged.

¶23. The law, for obvious reasons, permits paternity actions when the determination of paternity is somehow vital to the welfare of the child. The law, however, does not contemplate a "no paternity" action, the sole purpose of which is to disprove the paternity of someone who enjoys the common law presumption of paternity by virtue of his marriage to the mother at the time of conception. Evidence against the paternity of a presumptive parent only becomes relevant when it would tend to establish paternity in another. This case comes dangerously close to being merely an academic exercise in proving lack of paternity - an exercise that ought not to be tolerated as being against public policy. The underlying purpose of the litigation is clearly not to establish Mr. Easter's paternity for the purpose of gaining for the child those legal advantages that would flow from such an adjudication. Mr. Easter, by his own admission, sits with pen in hand ready to sign over his parental rights to Mr. Rafferty the moment the ink is dry on the judgment establishing his parenthood.

¶24. Upon remand, before the case is retried on the merits, we direct that the following events occur:

1. That the issue of whether the child's mother is a necessary party be considered based on the fact that her entitlement to future child support payments from Mr. Perkins hinges on the outcome of the litigation.

2. That an independent and fully-engaged guardian ad litem be appointed to represent the best interests of this child in this litigation and that the costs of this representation be shared equally between Mrs. Rafferty and Mr. Easter, and that the chancellor take reasonable measures to (a) inquire into the scope of the representation that the guardian ad litem concludes will be necessary, (b) obtain a reasonable estimation of the costs of that representation, and (c) make proper assurances, in advance, that both parties responsible for paying these fees will unequivocally meet that responsibility so that the guardian ad litem may proceed to fully represent the child's interests without the distracting concern of whether the guardian will be properly compensated for this valuable service.

3. That present counsel of record for the child be removed from any further representation of the child's interests because of the evident potential for conflict of interest that exists by virtue of the attorney's former representation of the child's mother, individually.

4. That proper steps be taken to charge the guardian ad litem with making full inquiry into whether the continued pursuit of an adjudication of Mr. Easter's paternity is in the child's best interest, when the sole purpose of that litigation appears on its face to be, not to derive some positive benefit for the child from that adjudication, but rather to merely cut off those paternal rights that are now granted to Mr. Perkins under the law without any indication as to why such a determination would serve the child's interests. Such findings and conclusions by the guardian ad litem, after full inquiry and consideration of all prospective benefits to accrue to the child by an adjudication of paternity should be reduced to writing and filed with the clerk as a part of the record of the case.

5. Assuming, for purposes of discussion only, that the guardian ad litem decides that the child's best interest would be served by a continuation of this litigation, the chancellor should, nevertheless, in his role as super guardian for this child, undertake his own inquiry into the reasoning of the guardian ad litem for continuing the litigation to satisfy himself independently that there is some arguable basis for the notion that the child's, and not the mother's, interest would be served by so doing.

¶25. In the event there is a determination made by the chancellor that this litigation does nothing to advance the separate interests of the minor child, then this cause should be dismissed without prejudice; otherwise, the matter would be subject to retrial on the merits upon the proper request of the guardian ad litem.

¶26. **THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS REVERSED AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN LISA RAFFERTY AND VERNON WAYNE PERKINS, JR.**

**SOUTHWICK, P.J., BRIDGES, COLEMAN, DIAZ, LEE, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

IRVING, J., DISSENTING:

¶27. With great deference to the collective wisdom of the majority, I must respectfully dissent from the ultimate conclusion reached by my colleagues. I agree with the majority that this case must be reversed, but since there is no basis for a retrial, I would simply reverse and remand to the trial court with directions to enter an order adjudicating Gerald F. Easter the father of Justin Perkins and setting the appropriate amount of child support. I am compelled to reach this conclusion because on the basis of this record, I find that during the period when Justin Perkins was conceived, Lisa Marie had engaged in sexual relations with only three persons, namely, Gerald F. Easter, Michael Rafferty, and Vernon Wayne Perkins, Jr. Rafferty and Perkins have both been excluded as the biological father by DNA paternity testing. That leaves only Easter whose probability of paternity was established at 99.94%.

¶28. This paternity case has its genesis in the Chancery Court of Desoto County where on September 23, 1993, Lisa Marie (Fry) Perkins Rafferty (Lisa Marie), individually and as next friend of Justin Patrick Perkins, filed a paternity action against Vernon Wayne Perkins, Jr. (Vernon), her former husband. In her petition, she alleged that while the parties were married she gave birth on March 3, 1992, to Justin Patrick Perkins (Justin) and that subsequent to the divorce between her and Vernon, she had discovered through scientifically-accepted tests that Vernon was not the natural father of Justin and that one Gerald F. Easter (Gerald) was the biological father of Justin. A copy of the DNA test report was attached to the petition and showed a 99.76% probability that Gerald was the biological father of Justin. A motion seeking to have Vernon submit to a paternity blood test was filed contemporaneously with the petition for determination of paternity.

¶29. Vernon answered the petition and denied the allegation that he was not the father of the child. Additionally, he alleged that he was the presumptive father because Justin was born during the marriage and that Mississippi law did not allow for blood testing of him.

¶30. On January 4, 1994, the chancellor overruled Lisa Marie's motion for blood testing of Vernon and certified the issue to the Mississippi Supreme Court. The Supreme Court denied the interlocutory appeal on June 2, 1994.

¶31. On December 29, 1994, the chancellor transferred the case to the County Court of Desoto County pursuant to Lisa Marie's motion for transfer so as to allow a more speedy trial of the matter. On January 17, 1995, Lisa Marie sought a reconsideration of her motion to compel Vernon to submit to a blood test.[1] On February 3, 1995, the county court judge appointed a guardian ad litem for Justin. On March 11, 1995, the guardian ad litem advised the county court judge that it was in the best interest of Justin to have Vernon blood tested. Thereafter, on May 9, 1995, the county court judge ordered Vernon to submit to a blood test. On May 16, 1995, Vernon filed for an interlocutory appeal and stay of proceedings. On the same date, the county court judge reversed himself as to requiring Vernon to submit to a blood test.[2]

¶32. On July 25, 1995, Lisa Marie filed a motion to join Gerald Easter as an additional plaintiff. Attached

to her motion was an affidavit executed by Gerald. In her motion she alleged, *inter alia*:

The plaintiff, Rafferty, would show that pursuant to Rule 19 M.R.C.P. that Gerald Easter is a party in real interest in this case in that he is the biological natural father of the child, Justin Patrick Rafferty.

By joining in said motion the said Gerald Easter does hereby request that all relief requested in the Petition to determine paternity of a minor be awarded to him and that said relief after hearing be afforded to him as if it had been particularly prayed for in the original Petition.

Gerald Easter's affidavit, which was attached to the motion to join additional plaintiff, stated: I, Gerald Easter, do hereby join in the Motion to be joined as an additional Plaintiff in the above styled and numbered cause [as] my free and voluntary act and deed and for the purposes therein expressed and do hereby state and affirm that the matters alleged in said motion are true and correct as therein stated.

¶33. On August 3, 1995, Vernon objected to the addition of Easter as a party plaintiff, alleging that Easter was time barred by the general three-year statute of limitation. On November 22, 1995, the county court judge overruled the motion to add Gerald as a party plaintiff on the basis that the three-year statute of limitation barred such addition. On November 2, 1995, Vernon filed a motion to dismiss the paternity action by Lisa Marie because same was alleged to be time barred by the one year statute of limitation. This motion was overruled and the case set for jury trial on March 11 and 12, 1996. On December 13, 1995, Vernon filed a motion to dismiss the paternity action, alleging, among other things, that he and Lisa Marie had joint legal custody of Justin, that joint legal custody requires the parties to share equally in major decisions, that Lisa Marie had pursued the paternity action without authorization from the chancery court. This motion was also overruled. On March 8, 1996, Lisa Marie filed a motion to add Gerald as a defendant and delete herself as a plaintiff. Additionally, she asked to be allowed to remain as the mother and next friend of Justin. Attached to this motion was an affidavit of Gerald Easter wherein he swore, *inter alia*:

> [T]hat he is an adult resident citizen of the State of Tennessee and does join in this Motion to be added as a party Defendant realizing the legal consequences of said act and that he is a duly licensed practicing attorney in and for the State of Tennessee and that he is fully aware of his rights, obligations and responsibilities that may be attached to him as a result of joining in as a party Defendant in the above styled and numbered cause and does hereby voluntarily appear in this cause of action as a necessary party and does assent to being joined as a necessary party in order that complete justice may be dispensed with regard to the minor child, Justin Patrick Perkins.

¶34. On March 11, 1996, Vernon filed a response to Lisa Marie's motion to delete herself individually and add Gerald as a defendant. In his response, Vernon alleged:

Defendant, VERNON WAYNE PERKINS, JR,, has no objection to Plaintiff, LISA MARIE (FRY) PERKINS RAFFERTY, removing herself as a Plaintiff in this case.

However, Defendant, Vernon Wayne Perkins, Jr., does object to the attempt by Lisa Marie (Fry) Perkins Rafferty, under the guise of being the next friend of Justin Patrick Rafferty, to add Gerald Easter as a defendant herein. First and foremost, in the Decree of Divorce filed between Vernon Wayne Perkins, Jr. and Lisa Marie (Fry) Perkins, in cause number 92-4-532 in the Chancery Court of Desoto County, Mississippi, the Chancellor ordered:

> (2) That Plaintiff and Defendant are hereby awarded joint and physical legal custody and control of

<u>the parties' minor child.</u>

*Since Vernon Wayne Perkins, Jr. has joint legal custody of Justin Patrick Perkins, Defendant submits that Lisa Marie Fry Perkins Rafferty cannot unilaterally cause Justin Patrick Perkins to bring an action for paternity against Gerald Easter. In fact, as Defendant has previously argued, Lisa Marie (Fry) Perkins Rafferty did not have the authority to unilaterally file this action against this Defendant, ostensibly on behalf of the minor child without the permission of the joint custodian.*

Thus Vernon Wayne Perkins submits that before the Court can even consider this latest motion of Plaintiff or even proceed further with this action at law, the Court must dispose of the issue of whether Lisa Marie (Fry) Perkins Rafferty has standing to pursue this action on behalf of the minor child, Justin Patrick Perkins, without the permission of the joint custodian.

A second issue related to this motion is that Lisa Marie (Fry) Perkins Rafferty is also filing this Motion to add Gerald Easter as a party without the benefit of the agreement of the guardian ad litem appointed by this court for the sole purpose of determining the best interests of the child, Justin Patrick Perkins. That is, *even if this court could find that Lisa Marie (Fry) Perkins Rafferty had the standing to file a paternity action against Gerald Easter without the agreement of Vernon Wayne Perkins, that is not enough! The guardian at litem must also agree after a full investigation into the matter that it is in the best interests of the minor child to file an action for paternity against Gerald Easter.* This is particularly crucial where the child recognizes Defendant, Vernon Wayne Perkins, Jr. as his father; where Vernon Wayne Perkins, Jr. has provided court ordered financial support to the child; where Vernon Wayne Perkins and the child especially have very strongly bonded over the years since the child's birth; and where Defendant and Defendant's parents are willing to retain and maintain that relationship regardless of who may be the biological father.

On the other hand, Gerald Easter has apparently never had anything to do with this child, has not supported him, has not bonded with him and there is no evidence that he intends to be a physical, psychological and emotional "father" for the child. Given these circumstances, Defendant, Vernon Wayne Perkins, Jr. submits that this Court should <u>NOT</u> grant the motion of Lisa Marie (Fry) Perkins Rafferty, ostensibly as the next friend of Justin Patrick Perkins. *Further, Defendant submits that the Court should require the guardian ad litem to conduct a thorough investigation into the physical and psychological benefits and detriments of continuing this cause of action. Defendant further submits that the Court should then hold a full hearing concerning the benefits and detriments as related to the best interests of the child. Any investigation by the guardian ad litem should include extensive consultation with and testing by professionals in the field of child psychology and child social relationships.*

Wherefore, premises considered, Defendant, Vernon Wayne Perkins, Jr. respectfully moves the Court to deny the Motion of Plaintiff, Lisa Marie (Fry) Perkins Rafferty ostensibly on behalf of the minor child, Justin Patrick Perkins as not being in the child's best interest. (Emphasis added).

¶35. On March 11, 1996, the county court judge granted the motion to permit Lisa to withdraw in her individual capacity and add Gerald as a party defendant. In the order permitting the amendment, the county court judge ordered that the guardian ad litem be mailed a copy of the order and directed the guardian ad

litem to file any and all reports or responses that he deems necessary on or before March 19, 1996. On March 19, 1996, the guardian ad litem filed, in letter form, the following report:

TO THE COURT:

The Guardian Ad Litem believes it to be in the best interest of the child that:

1. The true lineage of the child be determined.

2. That biological information be made readily available from the natural parents for any future medical needs.

3. That the child be informed at the appropriate time in his future, if he so desires to know, as to the truth of his natural lineage.

4. That whatever determination is made as to lineage, that the child be allowed reasonable visitation and contact with the families, i.e. Perkins and Fry families to whom he has grown accustomed so long as the environments of both families serve the best interest of the child's nurturing.

¶36. The case finally went to trial on April 30, 1996, and at the conclusion of the trial, the jury returned the following verdict: "We the jury find that the defendant Gerald Easter is the biological father of the child, Justin Patrick Perkins." The trial judge entered judgment accordingly. However, the county court judge sustained a motion for new trial filed by Vernon. In granting Vernon's motion, the trial judge concluded: (1) he had erred in allowing into evidence the results of the paternity blood tests taken by Gerald and Justin, and (2) inasmuch as Lisa Marie and Vernon had joint legal custody of Justin, Lisa Marie should have obtained the permission of the chancellor before proceeding with the paternity action. The trial judge held that the blood tests were not performed in accordance with the statutory provisions of Miss. Code Ann. § 93-9-23 (Rev. 1994).[3] The county court judge then transferred the case back to the Chancery Court of Desoto County with a recommendation that the chancellor appoint the existing guardian ad litem "to continue to serve as guardian ad litem whose service will benefit the court and child as he is already most familiar with this case."

¶37. On August 7, 1996, the chancellor, upon motion of Lisa Marie for blood tests pursuant to Miss. Code Ann. § 93-9-21 (Rev. 1994), ordered Justin, Lisa Marie, Gerald and Vernon to submit to blood tests. Pursuant to the court order, the tests were performed by Genetic Design, using DNA probe technology. The results were: Vernon Wayne Perkins, Jr. was excluded as the biological father of Justin Patrick Perkins, and Gerald Easter was given a 99.94% probability of being the biological father of Justin. The results of these tests were admitted into evidence during the new trial held in the chancery court.

¶38. On March 21, 1997, the jury retired to consider its verdict and returned the following verdict: "We the jury find in favor of Defendant Vernon Wayne Perkins, Jr." The chancellor entered judgment accordingly. Justin, by and through Lisa Marie, filed a motion for a JNOV, or in the alternative, for a new trial. The motion was overruled by the chancellor. It is from this ruling that this appeal emanates.

¶39. The following issues, taken verbatim from appellant's brief, are assigned on appeal:

ISSUE I.

The County Court erred in setting aside a jury verdict that Gerald F. Easter was the biological father of Justin Patrick Perkins.

## ISSUE II.

The Chancery Court erred by granting instructions D-2 and D-5 regarding the burden of proof which are in conflict with P-3 and are prohibited by § 93-9-27 of Mississippi Code (As Amended) when the blood test excluded Vernon Wayne Perkins as the biological father.

## ISSUE III.

The Chancery Court erred by allowing the Defendant's attorneys to make arguments to the jury concerning the method of blood test when Defendant, Vernon Wayne Perkins, did not challenge the method of the blood test as provided by § 93-9-23 of the Mississippi Code (As Amended) and further erred by allowing the defense counsel to make arguments concerning the absence of certain testimony of each and every person who analyzed the blood pursuant to § 93-9-23 when such parties were available to the Defendant to appear as witnesses pursuant to § 93-9-23.

## ISSUE IV.

Defendant, Vernon Wayne Perkins, failed to rebut by a preponderance of the evidence the presumption of paternity created by § 93-9-27 of the Mississippi Code (as amended) when the blood test presented a 99.94% probability that Gerald F. Easter was the father of Justin Patrick Perkins.

## ISSUE V.

The verdict is against the overwhelming weight of the evidence and the Chancery Court erred by failing to reinstate the original County Court verdict.

## ISSUE VI.

The Chancery Court erred by failing to either grant a judgement notwithstanding the verdict or a new trial because the verdict was against the overwhelming weight of the evidence.

¶40. The majority frames the issue on appeal as being "whether a jury verdict on the question of the child's

paternity may be permitted to stand." The majority then commences an expose on the personal life of Lisa Marie which has little if anything to do with the real issues before the court. Who she slept with and why is no business of this court, nor is the appropriateness of her moral code for this court to judge.

¶41. After implicitly frowning on the choices made by Lisa Marie, which led to the factual state of affairs presented, the majority then, in the face of irrefutable scientific evidence, decides that this case should be reversed but not rendered because the majority, in a very pious way, finds Lisa Marie's conduct reprehensible, the guardian ad litem incompetent, and the attorney who represented Justin to be in conflict because he previously represented Lisa Marie in her individual capacity.

¶42. One need not look beyond the matters which the majority orders must occur before the case is retried to ascertain that the majority's real goal is to prevent the matter from ever being retried. None of the issues, upon which the majority relies for its decision that the case should be remanded for further consideration, were presented as an issue here. Further, the main basis for the majority's remanding the case is its conviction that the interests of the child, Justin, were not served by the appointed guardian ad litem. However, apparently, the chancellor found the guardian ad litem competent and that he rendered good and valuable service. It would appear to me that the majority cannot, *sua sponte,* slam dunk the guardian ad litem without first finding the chancellor in manifest error for appointing the guardian ad litem and accepting the advice given by the guardian ad litem. Absolutely nothing in this record impugns either the integrity or competency of the guardian ad litem. It should be pointed out that the county court judge recommended that the chancellor appoint the same guardian ad litem for retrial of the case in chancery court who had served the child's interest while the case was in county court. This, of course, is the same guardian ad litem who the majority finds, by implication, rendered woefully inadequate service to the child.

¶43. What is equally indefensible to me is that the rationale adopted by the majority for reversing and remanding for further consideration, incorporates the same argument made by Vernon in the court below in his response to Lisa Marie's motion to delete herself individually and add Easter as a party defendant. Vernon did not file a cross-appeal asserting any of the matters which form the cornerstone of the majority's rationale for reversing for further consideration, even though he had raised those precise issues before the court below. By what authority then does the majority, *sua sponte,* raise and then paternalistically instruct on matters not raised by the parties? Could it be plain error? I think not. There is nothing so egregious, or prejudicial to Justin, about a guardian ad litem having a different perspective than the majority about what is in the best interest of the minor child.

¶44. The majority lambasts and depicts Lisa Marie and Gerald as co-conspirators involved in some diabolical plot which could only be prejudicial to, and not in the best interest of, the minor child. I fail to see the nexus in such a quantum leap in judgment. It is noteworthy that Justin, the minor child, has been in the custody of Lisa Marie and her new husband, Michael Rafferty, since Justin was nine months old. It is true that Vernon has had visitation with Justin on a regular basis since that time as well, but it takes more than the majority's moral compass to convince me that it will be prejudicial to Justin's interest to allow an adjudication as to his biological father because, as the majority says, the real purpose of such an adjudication is to effectuate the adoption of Justin by Michael Rafferty, the stepfather. Well, as aforestated, Michael has been with Justin since Justin was nine months old. What's the big deal? There is no allegation or proof in this record that Michael would not be a suitable parent for Justin unless one accepts the not-so-subtle suggestion of the majority that because Lisa Marie and Michael had an adulterous relationship in a former life, he is *ipso factor* declared *persona non grata*. Judging by this standard, many parties in second

marriages in this society would not be deemed suitable parents. Moreover, on the facts of this case, it is beyond the judicial reach of this court to determine the propriety of whether Gerald should be permitted to allow the adoption of his son, Justin, by Lisa Marie and Michael. In a paternity action, the issue is paternity, not adoption. That Lisa Marie, in her petition for determination of paternity, stated that Gerald was amenable to allowing Justin to be adopted after Gerald's paternity was established, does not change the legal fact that adoption is not an issue in a paternity suit. Thus, this issue of adoption should be of no concern to the court in resolving the true issue before it.

¶45. The majority focused much of its attention on the actions of Lisa Marie, the guardian ad litem and the attorney representing Lisa Marie and Justin, and crafted a solution which the majority concludes, on remand, will protect the interest of Justin, an interest which the majority strongly suspects has not been protected thus far. While the evidence and issues before this court do not permit the majority to take the liberty it has taken in crafting the resolution it has crafted, it appears to me that it could all be for naught because like the plaintiff in *Harrington*, Gerald Easter alone could initiate a paternity action against Vernon Wayne Perkins, Jr. In such a suit, neither Justin nor Lisa Marie would have to be a party, and the need for a guardian ad litem would be eliminated. When Lisa Marie attempted to bring Gerald in as a plaintiff in the present suit, Vernon's statute of limitation-based objection to Gerald's being brought in was sustained by the county court judge. However, nothing in our statutes or case law prohibits a putative father from bringing a paternity action more than three years after the birth of the child. Miss Code Ann. § 93-9-9 (Supp. 1998) states in pertinent part as follows:

> Paternity may be determined upon the petition of the mother, or father, the child or any public authority....However, proceedings hereunder shall not be instituted by the Department of Human Services after the child has reached the age of eighteen (18) years but proceedings may be instituted by a private attorney at any time until such child attains the age of twenty-one (21) years unless the child has been emancipated....

¶46. In *Harrington,* the putative father, Ivy, brought suit over five years after the mother of the children and her husband had divorced. And what's more, the presumptive father, Phillip Harrington, had been granted custody in the divorce proceeding of the two children alleged by Ivy to be Ivy's.

¶47. Further, I find no authority that even Lisa Marie was or is prohibited from bringing such a paternity action in her individual capacity without first being authorized by the chancellor because of the custody provision in the divorce decree. I am unconvinced that such a custody provision can override the clear authority and privilege or right given in the above-quoted statute. I am mindful, however, of the argument that would be made that Lisa Marie should be estopped from bringing such an action because of the recitals contained in the divorce petition regarding the birth of the minor child. While a party seeking a divorce is required to state in the petition or complaint whether minor children were born during the marriage, I would not equate pleading a required allegation that a certain child or children were born during the marriage with a declaration that the husband is the biological father of the child or children. And in this case, Lisa Marie and Vernon resolved their marriage on the basis of irreconcilable differences. Parties to a divorce complaint grounded on irreconcilable differences are not required to swear to any of the allegations in the complaint, and even in a fault-based complaint, the party seeking the divorce is only required to swear that the complaint "is not filed by collusion with the defendant for the purpose of obtaining a divorce, but that the cause or causes for divorce stated in the complaint are true as stated." Miss. Code Ann. §93-5-7 (Rev. 1994). Hence, I can see no basis for a holding that Lisa Marie would be, or should have been, estopped

from bringing this action in her individual capacity.

## CONCLUSION

¶48. Every impediment and subterfuge was utilized in the court below to prevent an adjudication of paternity as to Justin Patrick Perkins, and in my humble opinion, I believe the majority continues the process by its holding today. In the court below, there was first the attack that the case was not an action to determine paternity but to terminate parental rights of the ex-husband. An effort was made to cure that problem by bringing the putative father into the case as a party plaintiff. That effort was thwarted by the trial judge in an erroneous reliance on an inapplicable statute of limitations and the exhorting of form over substance. This is, in my opinion, plain error of which I would take note.[4] Next Lisa Marie was attacked on the basis that she could not bring the action because she did not have the permission of the chancellor who entered the custody order in the divorce decree. She moved to remedy this impediment, or more appropriately put, this red herring, by moving to dismiss herself from the lawsuit in her individual capacity and bring Gerald in as a party defendant. After this was done, the next hurdle was that she still could not proceed because, even if she could proceed without a court order authorizing her to do so without Vernon's consent, the assent of the guardian ad litem was necessary, and before the guardian ad litem could render an opinion he needed to have a perfectly normal child pyschologically tested to determine if the child would suffer some detriment as a result of these proceedings. The guardian ad litem made his report in favor of the matter proceeding, presumably without subjecting the child to any psychological tests. Now this court assails the guardian ad litem when that issue is not before the court.

¶49. All of this had taken place against a backdrop where the presumptive father has been absolutely excluded as the father, and Gerald Easter has been given probabilities of 99.76% and 99.94%, in two separate tests, that he is in fact the father of the minor child involved. Vernon Wayne Perkins, Jr. sought to do in the court below what the empirical evidence forbids, and it appears to me that the majority continues the unfortunate saga of the parties by engaging in a little social engineering to accomplish the same. While it may be distasteful and offensive to the social values to some what Lisa Marie Perkins Rafferty did in seeking to have Gerald F. Easter declared to be the natural father, I can find no statutory or case law prohibiting what was done. Until the society as whole, through legislative action, voices its disdain for the conduct decried by the majority's opinion, I believe we are without legal authority to do so. Additionally, I cannot accept the notion that the child's interest was not necessarily served by the guardian ad litem. After all, Justin was only nine months old when Lisa and her new husband, Mike Rafferty, were married. On these facts, it is difficult to see how Justin would be so adversely affected by eventually being adopted by a stepfather whom he has been around almost since birth.

¶50. Therefore, since Vernon Wayne Perkins, Jr. has been scientifically excluded as the biological father, I do not see the point in remanding for a retrial because even in that eventuality, the results as to paternity, would be the same as now if blood testing was redone on retrial. And the safeguards proposed by the majority's opinion cannot keep this matter from proceeding without the safeguards if Gerald Easter, under the authority of *Harrington,* proceeds to file his separate complaint against Vernon Wayne Perkins, Jr. Finally, I am not insensitive to the plight of Mr. Perkins, but the cold facts are that what happened to him is not novel in the annals of human history; it is just that scientific technology has now made it possible to overcome some long held presumptions which heretofore gave us a measure of artificial comfort, or in some cases, permitted us not to know and face the obvious. That was then and this is now. I regret that my colleagues have not seen fit to forthrightly address a situation that technological advances have thrust upon

us.

**KING, P.J., JOINS THIS SEPARATE WRITTEN OPINION.**

1. The motion for reconsideration was based on the Supreme Court's holding in *Ivy v. Harrington,*

644 So. 2d 1218 (Miss. 1994). In *Harrington,* the putative father, Richard Ivy, brought an action to establish paternity and asked for blood tests in a case where two children, alleged to be his, were born during the marriage of Phillip Harrington and Pearlie Jernigan Harrington. Phillip Harrington was made a defendant in Ivy's suit. Ivy alleged that he and Pearlie had had an adulterous relationship during Pearlie's marriage to Phillip and that two (2) of the four children born during that marriage were Ivy's and not Phillip's. The chancellor denied Ivy's request for blood tests and dismissed his petition. The Supreme Court reversed and held that Ivy had standing to bring the action notwithstanding the fact that the children were born during the mother's marriage to another, and that Ivy was entitled to have the blood tests. *Id.* at 1219.

2. The county court judge gave the following reason for reversing himself:

The paternity laws of the State of Mississippi are intended to affirmatively establish and determine the natural father of the child. The petition filed herein is filed pursuant to the statutes regarding paternity under Section 93-9-1, et seq, attempting not to affirmatively establish or determine paternity, but rather to rebut one of the strongest presumptions known to law. The petition makes allegations that the biological father is one other than Perkins. There is no contesting that Perkins is the man to whom Lisa Marie (Fry) Perkins Rafferty (Rafferty) was married when the child, Justin Pat rick Perkins, (child) was born. Rafferty does not name Perkins as the alleged father of the child. And while there is a request to declare the natural father to be a person other than Perkins, that person did not initiate this proceeding as in Ivy v. Harrington, 644 So 2d 1218 (Miss.1994), nor is he named as a party. Therefore, the Court could not, and cannot, pursuant to Mississippi paternity law, affirmatively determine paternity in this case without having before it the alleged father.

After a thorough review of the pleadings identifying the parties before the Court, and a review of all applicable law, the Court must reverse its earlier ruling and deny the request for an order requiring Perkins to submit to blood-testing, and in so doing finds that Section 93-9-21 as amended cannot be used to require Perkins to be blood-tested at this time due to the current makeup of the parties herein.

3. It is not clear from the record in which way the performance of the tests failed to comply with the requirements of the quoted code section.

4. Of course, a holding that the trial judge improperly denied the request to allow Gerald Easter to enter the case as a party plaintiff has significant ramifications because with Gerald in as a party plaintiff and Vernon in as a defendant, there would be no need for Justin as a party appearing by and through Lisa Marie as next friend. This arrangement would negate the need for a guardian ad litem. Hence, all the discussion about Lisa Marie not being a proper party to bring the action, and about the alleged shortcomings of the guardian ad litem, would be moot.